```
                                                    FILED
                                                  JUN 23 2016
                                            CLERK US DISTRICT COURT
                                         SOUTHERN DISTRICT OF CALIFORNIA
                                         BY                       DEPUTY
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 16CR1457-GPC  JLS |
| v. | **INFORMATION** |
| GENTRY DEBORD, | Title 18 U.S.C., Sec. 371- Conspiracy To Commit Bribery |
| Defendant. | |

The United States charges that, at all times relevant:

1. From in or about November 2007 to May 2010, defendant GENTRY DEBORD ("DEBORD") was a Lieutenant in the U.S. Navy serving as a Logistics Officer and a Stock Control Officer aboard the U.S.S. Essex, an amphibious assault ship deployed in the Western Pacific. In these positions, DEBORD was responsible for procuring goods and services to meet the ship's logistical and supply needs and for verifying that the U.S. Navy's contractors provided these services. From in or about May 2010 until December 2011, DEBORD was a student at the Naval Postgraduate School in Monterey, CA. From in our about December 2011 to in or about August 2013, DEBORD was a Lieutenant Commander serving in Singapore as a Replenishment Officer with the Logistics Group Western Pacific, Task Force 73, a U.S. Navy command that served as the logistics agent for U.S. Navy assets in the Western Pacific. As a Replenishment Officer, DEBORD was responsible for coordinating the movement of U.S. Navy supply ships to ensure that they resupplied U.S. Navy combatant ships operating throughout the Western Pacific region.

2. As an Officer in the United States Navy, DEBORD was a "public official" within the definition of Title 18, United States Code, Section 201(a)(1).

3. Leonard Glenn Francis ("Francis"), was a citizen of Malaysia, residing in Singapore. Francis was the owner, Chief Executive Officer, and President of Glenn Defense Marine (Asia) ("GDMA"), a multi-national corporation with headquarters in Singapore. As of September 2013, GDMA had operating locations in many countries, including Japan, Thailand, Malaysia, Korea, Hong Kong, Indonesia, Australia, Philippines, and the United States. GDMA provided husbanding services to the U.S. Navy under a variety of husbanding contracts for over 25 years. "Husbanding" involved the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when they arrived at port.

4. Alex Wisidagama ("Wisidagama"), a citizen of Singapore, was GDMA's Global Manager for Government Contracts. On March 18, 2014, Wisidagama pled guilty to conspiring to defraud the United States with respect to claims in violation of 18 U.S.C. § 286.

5. NP was GDMA's Vice President of Global Operations.

6. The offenses described herein began or were committed out of the jurisdiction of any particular district, and the offender, DEBORD, as well as one or more joint offenders was arrested within the Southern District of California.

//
//
//
//

## COUNT ONE - Conspiracy (18 U.S.C. § 371)

7. The allegations in Paragraphs 1 through 6 of this Information are hereby re-alleged and incorporated herein.

8. From in or about November 2007 to at least January 2013, on the high seas and out of the jurisdiction of any particular district, defendant GENTRY DEBORD, a public official, Leonard Glenn Francis, and others (1) knowingly and unlawfully combined, conspired, and agreed to commit bribery, that is, DEBORD, Francis, and others, knowingly agreed that, in return for DEBORD being influenced in the performance of official acts, being influenced to commit and aid in committing and to collude in and allow any fraud, and make opportunity for the commission of any fraud on the United States, and being induced to do and omit to do acts in violation of his official and lawful duties, all as opportunities arose, (a) Francis and others would directly and indirectly, corruptly give, offer, and promise things of value to DEBORD, including but not limited to cash, travel and entertainment expenses, and the services of prostitutes, and (b) DEBORD would directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept these things of value; and (2) DEBORD and Francis took overt acts in furtherance of this conspiracy and to effect its unlawful object, in violation of Title 18, United States Code, Sections 201(b)(1)(A), (B), and (C) and 201(b)(2)(A), (B), and (C).

### OBJECT OF THE CONSPIRACY

9. It was the object of the conspiracy for DEBORD to use his position and influence in the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose, by, among other

things, providing Francis and others with internal, proprietary U.S. Navy information; committing and making opportunity for the commission of fraud on the United States by directing Francis and GDMA to inflate invoices to reflect services not rendered; and advocating for the U.S. Navy to procure items from GDMA under its husbanding contracts. In return, Francis and others would offer things of value to or on behalf of DEBORD, such as cash, travel and entertainment expenses, and the services of prostitutes.

METHODS AND MEANS OF THE CONSPIRACY

10. In furtherance of this conspiracy, and to accomplish its object, the following methods and means were used, among others:

    a. DEBORD would demand, seek, receive, and accept things of value from Francis and others.

    b. Francis and others would offer and give things of value to or on behalf of DEBORD, including cash, travel and entertainment expenses, and the services of prostitutes.

    c. In return for these things of value, DEBORD would use his position and influence in the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose.

    d. DEBORD would attempt to conceal the nature and source of the bribe payments that he received from Francis and others by, among other things: using fictitious email accounts to communicate with GDMA; on at least one occasion by instructing GDMA to fraudulently inflate its bills to the U.S. Navy as a means to cover the cost of the things of value provided to DEBORD; and by falsely referring to the bribe payments and prostitutes by code words and using coded language and other mechanisms designed to obfuscate the true nature of their corrupt relationship, including

referring to prostitutes as "cheesecakes" and "bodyguards" during communications with Francis and others.

OVERT ACTS

11. In furtherance of the conspiracy and to effect its object, the following overt acts, among others, were committed:

    a. On or about February 26, 2008, DEBORD emailed NP to ask that NP provide him with the services of prostitutes during the U.S.S. Essex's upcoming port visit to Manila, Philippines: "[D]ouble checking to see if I will have my security for the 2nd and the 4th. I however do not want anyone to know I have a bodyguard." NP responded: "Bodyguards are standing by."

    b. On or about May 7, 2008, DEBORD advised Wisidagama via email that DEBORD had recommended that the U.S. Navy cancel its plans to re-supply the U.S.S. Essex at sea using food and provisions already owned by the U.S. Navy and instead that the U.S.S. Essex purchase the needed items in port. On or about June 5, 2008, DEBORD sent Wisidagama and NP a request to purchase additional items from GDMA: "[I]s it possible to send me a list of food items you have available (luxury items) like cheesecake, etc, so we can possibly add to our order."

    c. On or about June 8, 2008, DEBORD was booked a deluxe room at the Siam Bayshore Hotel in Pattaya, Thailand at GDMA's expense, in conjunction with an upcoming port visit by the U.S.S. Essex to Laem Chabang, Thailand.

    d. On or about June 13, 2008, a GDMA employee forwarded Wisidagama and NP the confirmation in DEBORD's name at a serviced apartment in Pattaya, Thailand, which noted as well the receipt of a pre-payment by GDMA of 3,742 Thai baht.

e. On or about October 13, 2008, DEBORD sent Wisidagama and NP via email pictures of a woman, commenting "This is the cheesecake I want…"

f. On or about October 30, 2008 DEBORD emailed NP and Wisidagama advising them that the U.S. Navy's ship husbanding contract in the Philippines was "coming up for renew[al]," and asking that GDMA provide him with an apartment in conjunction with an upcoming port visit by the U.S.S. Essex to Hong Kong. DEBORD noted that he and another GDMA employee "had fun up [near Clark Air Force Base, Philippines,] ate lots of cheesecake, even ate some in a group session."

g. On or about November 12, 2008, DEBORD sent NP an email discussing the after action report regarding the service received by the U.S.S. Essex from GDMA during its recent port visit to Hong Kong.

h. In the same email of November 12, DEBORD asked NP to provide him with a stay at a furnished apartment in Hong Kong: "What about my apartment [NP]. I need a 3BDR one if you can. Away from sailors but near bars/clubs/cheesecakes."

i. On or about November 17, 2008, a GDMA employee sent NP and Wisidagama an email confirming reservations for DEBORD and two others to stay in two furnished apartments for four nights (November 22-26, 2008) in Tsimshatsui, Hong Kong at a total cost to GDMA of $4090 Hong Kong dollars per night.

j. On or about February 8, 2009, DEBORD sent NP and Wisidagama via email an internal U.S. Navy document, entitled "LESSONS LEARNED FROM LAEM CHABANG PORT VISIT," which analyzed

difficulties during the U.S.S. Essex's recent port visit to Laem Chabang, Thailand, which was serviced by GDMA.

k. On or about February 8, 2009, DEBORD sent an email to NP and another GDMA employee inquiring about the cost of procuring a trash barge to service the U.S.S. Essex while in port at Laem Chabang, Thailand. When the GDMA employee quoted a price of $3,000, DEBORD responded, "We want the barge!!!! You owe me [NP], had to beg to make them pull the trigger."

l. On or about February 15, 2009, a GDMA employee forwarded to Wisidagama via email a reservation confirmation in DEBORD's name for a three-night stay (February 16-19, 2009) at the Siam Bay Shore Hotel in Pattaya, Thailand, noting, "this will be on our account together with his laundry and minibar."

m. On or about February 21, 2009, DEBORD forwarded to NP and Wisidagama via email proprietary, internal U.S. Navy correspondence in which a U.S. Navy logistics officer advised DEBORD that the logistics officer was investigating certain suspicious charges for force protection that GDMA submitted in connection with the husbanding services rendered to the U.S.S. Harper's Ferry and U.S.S. Essex in Laem Chabang, Thailand.

n. On or about March 17, 2009, DEBORD forwarded to NP an internal U.S. Navy email in which a U.S. Navy logistics officer expressed concern to DEBORD about an invoice that GDMA submitted for force protection services rendered to the U.S.S. Essex in Thailand. In the email, the logistics officer warned DEBORD to "be vigilant" about invoices from GDMA.

o. On or about July 31, 2009, in an email entitled "cheesecake," DEBORD forwarded to NP an email that contained cost

information for a port visit by the U.S.S. Essex to Brisbane, Australia, that was serviced by one of GDMA's competitors. NP, in turn, forwarded the information to Francis: "[S]ir, intel from our contact on the [E]ssex in [B]risbane."

p.  On or about August 18, 2009, a GDMA employee forwarded to NP and Francis via email airline and room reservations for DEBORD and his family to fly from Manila to Boracay, Philippines and stay five nights (October 5-10, 2009) at Friday's Boracay Beach Resort at a total cost to GDMA of 78,500 Philippine pesos.

q.  On or about February 22, 2010, DEBORD asked NP to provide him with three hotel rooms, two cell phones, a van and $2,000 Singapore dollars and instructed NP to recover the value of these items by inflating the amount that GDMA would invoice the U.S. Navy for potable water and trash removal service for the U.S.S. Essex port visit to Singapore from February 22-25, 2009. In an email to Francis and Wisidagama that same day, NP described his conversation with DEBORD: "Gentry called me up today and spoke to me about the bills and his (hotel rooms, 2 cell. phns and van). He told me that you can up the potable water and trash for the invoices to make back for this stuff. Break. Sir, he's asking for $2k [S]ing[apore] dollars as well. This to be included into the water/trash bills. Can get finance to prepare and [a GDMA employee] to hand to him. Please advise."

r.  In reply to NP's inquiries, Francis approved the payment to DEBORD, and as instructed by DEBORD, GDMA, in fact, fraudulently inflated its invoice to the U.S. Navy to account for the things of value given to DEBORD.

s. On or about March 19, 2010, DEBORD forwarded to NP an email exchange between DEBORD and a U.S. Navy logistics officer in which DEBORD recommended paying a GDMA claim against the U.S. Navy for $8,000 for damage done to GDMA equipment while providing husbanding services to the U.S.S. Essex during a port visit to Subic Bay, Philippines. DEBORD stated to the logistics officer, "I was ready to pay this bill because of discussion last year about sizes of fenders. . . Please give me guidance on what we do if we are responsible and have to pay?"

t. According to DEBORD's U.S. Navy personnel file, from about May 2010 until December 2011, DEBORD was a student at the Naval Postgraduate School in Monterey, California.

u. On or about May 26, 2012, after recognizing DEBORD's name on an email chain regarding fuel issues, NP emailed another GDMA employee and said, "Look at who's the replenishment officer for ctf73, you remember sex crazy LT Debord from Essex!" NP subsequently emailed DEBORD on May 28, 2012 and invited him out for "cheesecake…just like the good ol days."

v. On or about December 31, 2012, according to internal GDMA email, NP emailed Francis to advise: "[W]e need to sponsor the room charges" for DEBORD's stay at the Hard Rock Hotel in Bali, Indonesia from January 5-11, 2013. On or about June 4, 2013, Francis directed NP to go to Bali and take care of DEBORD because DEBORD "can slide ships to higher revenue ports."

w. Upon DEBORD's return from Bali, Indonesia, on or about January 21, 2013, Francis paid for DEBORD and his wife as well as another couple to dine at the Nadaman Restaurant in Singapore at a cost to Francis of approximately $1,651.90

- 9 -

Singapore dollars.  Following the meal, Francis purchased $70,000 Singapore dollars-worth of gaming chips from the Marina Bay Sands Casino, which he split between himself and his guests.  During the evening's festivities, Francis sent NP an instant message which exclaimed, "[G]entry [DEBORD] over the moon."  NP responded via instant message: "Hook, line and sinker."

　　All in violation of Title 18, United States Code, Section 371.

LAURA E. DUFFY
United States Attorney

By: _____
　　MARK W. PLETCHER
　　PATRICK HOVAKIMIAN
　　Assistant U.S. Attorneys


ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division

By: _____
　　BRIAN R. YOUNG
　　Assistant Chief
　　Fraud Section, Criminal Division